IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:14cr25-MHT |
| | ) | (WO) |
| BRIAN KALVIN JACKSON, JR. | ) | |

## OPINION

Defendant Brian Kalvin Jackson, Jr. pled guilty to being a felon in possession of a firearm, pursuant to 18 U.S.C. § 922(g)(1).  At his sentencing, the court granted Jackson's motion for a downward departure and his motion for a downward variance, sentencing Jackson to 40 months imprisonment followed by three years of supervised release.  Because this sentence was significantly below the applicable sentencing guideline range, the court believes an opinion explaining why is still warranted so that the record will be complete for future reference.

## I. Background

Jackson has had several run-ins with the law, including a felony conviction based on a first-degree robbery he committed in 2007, when he was 19. During the robbery, he stole cases of beer from a gas station while armed with a handgun.

In April 2013, Jackson was again charged with robbery, a felony, stemming from an attempted shoplifting incident. According to the Presentence Report, a loss-prevention officer at a store in Montgomery, Alabama, observed Jackson and two other men conceal merchandise and then attempt to leave the store with it. When the officer approached the men in the parking lot and asked them to return the items to the store, one of the men threw a stolen shirt at the officer and ran. The officer attempted to arrest Jackson, who then pulled a firearm from his waistband

2

and shot at the officer's feet.   The shrapnel burned the officer's leg.   Jackson ran but was apprehended by the officer and a second officer who had witnessed the theft.

Six months later, Jackson was charged with felony assault.   The alleged victim testified that Jackson shot near the victim's feet, but did not hit him.   A child was present during the altercation.   In this incident, Jackson was shot and paralyzed from the chest down.

After these incidents, Jackson was indicted for possessing a firearm as a felon.[1]  Following his arrest, Jackson spent part of his time in federal custody at the Montgomery County Detention Facility, and Jackson's health seriously deteriorated while at the jail. Jackson also received treatment at a hospital in

_____

1. He was also charged with assault in state court. The case remained pending, along with his robbery case.

3

Montgomery, Alabama, and a private detention center in Columbia, South Carolina.

## II. Discussion

The term of imprisonment for being a felon in possession of a firearm is zero to 10 years. 18 U.S.C. § 922(g)(1). As explained below, Jackson's initial Sentencing Guidelines range for this offense was 92-115 months. The government and Jackson did not reach a plea agreement in this case. Probation initially recommended a sentence of 115 months with three years of supervised release, the government recommended 60 months with three years of supervised release, and Jackson recommended time served with three years of supervised release. Before making a decision on downward departures and variances, this court sent Jackson for a presentence study, ordered Jackson's counsel to examine the medical care provided to him at

Montgomery County jail, and asked the government to prepare testimony on Jackson's alleged violence. During the final sentencing hearing, the government and probation both changed their recommendations to 48 months with three years of supervised release.

### A. Jackson's Initial Guidelines Calculations

Based on the underlying offense, felon in possession of a firearm, 18 U.S.C. § 922(g)(1), the starting point of the Guidelines calculation was USSG § 2K2.1. Because Jackson's conduct provided two possible sentencing calculations, the Guidelines stated that he should receive the greater of (1) an offense level under § 2K2.1, which included a four-level enhancement for using a firearm in connection with another felony offense, or (2) an offense level under USSG § 2X1.1 since Jackson used or possessed a firearm "in connection with the commission or the attempted

5

commission of another offense." The offense level was greater using § 2X1.1, which specified using the Guidelines for the substantive offense of robbery in this case. Therefore, before adjustments or departures, Jackson's base offense level was 20. USSG § 2B3.1. Jackson received a seven-point enhancement for the discharge of a firearm and a two-point enhancement because the victim sustained bodily injury. However, he received a three-level downward adjustment for acceptance of responsibility, placing his final offense level at 26.

Because of his past crimes, Jackson received five criminal history points. He also received an additional two points because he was on probation for the 2007 robbery at the time of the offense. USSG § 4A1.1(d). The seven points gave him a criminal-history category of IV.

6

The offense level of 26 and criminal-history category of IV resulted in an initial Guidelines range of 92-115 months.

### B. Downward Departure for Physical Condition

Jackson brought a motion for a downward departure based on his physical condition. <u>See</u> USSG § 5H1.4 ("An extraordinary physical impairment may be a reason for a downward departure.")  The motion was granted, and the final Guidelines range was set at 57 -71 months.

Jackson's physical impairments are extraordinary. Jackson was born with sickle-cell anemia, suffers from the ailment daily, and has regular sickle-cell crises. Sickle-cell anemia causes severe pain and other complications, such as potentially causing arteries to deteriorate and fail.

Jackson also suffers from deep-vein thrombosis, peripheral neuropathy, a neurogenic bladder (bladder

7

dysfunction), and 'muscle spasm and chronic-pain syndrome'. He requires catheterization multiple times per day and needs assistance performing essential daily functions. Jackson's health problems will persist the rest of his life.

In addition, due to his paralysis, Jackson wears a diaper because he cannot control his bowels and was only 113 pounds at five and a half feet tall. (His situation became significantly worse during his treatment at the county jail, as described below.)

Under USSG § 5H1.4, "a seriously infirm defendant" is a consideration that may warrant a downward departure. Jackson is seriously infirm and will have multiple difficulties adjusting to a prison environment. Both the government and Jackson agreed that a downward departure for Jackson's physical condition was appropriate, and the court granted a

five-level downward departure because of the severity
of his condition.


### C. Reasons for Variance

After determining the final Guidelines sentencing
range of 57-71 months, the court was guided by the
factors set forth in 18 U.S.C. § 3553(a) in determining
a reasonable sentence. Sentencing within the
Guidelines range is not mandatory after United States
v. Booker, 543 U.S. 220, 245 (2005). The Guidelines
range is an attempt to approximate the § 3553(a)
factors, but a trial court may decide during sentencing
that the Guidelines range does not succeed in that
regard and adjust accordingly. Rita v. United States,
551 U.S. 333, 351 (2007); see also United States v.
Todd, 618 F. Supp. 2d 1349, 1352-53 (M.D. Ala. 2009)
(Thompson, J.) ("[District courts] still must consult

the Guidelines and take them into account when sentencing defendants."). Jackson brought a motion for a downward variance based on his treatment while in federal custody, asking that he be released on time served of approximately 18 months or on a sentence of probation. The government agreed that Jackson should receive a variance, but disagreed that 18 months would be a suitable sentence.[2]

As described below, Jackson experienced substantial neglect and maltreatment while in federal custody by order of this court. Ordinarily, based on these facts, the court would have released Jackson after only a year of imprisonment. However, in this case, doing so would have done a disservice to both the community and to Jackson. Thus, the court granted Jackson a four-level downward variance, which resulted in a sentencing range

_____

2. While in favor of the variance, the government argued that it should be based on considerations other than Jackson's inadequate treatment at the Montgomery County jail. The court disagrees.

10

of 37-46 months, and sentenced Jackson to 40 months of
imprisonment followed by three years of supervised
release.  A more detailed explanation of the court's
reasoning follows.


### 1.   Conditions in Detention

Jackson's counsel hired an independent nurse, Diana
White, to examine Jackson's treatment at the county
jail.[3] Nurse White concluded that care at the Montgomery
County Jail was "substandard and life threatening."
July 13, 2015 Report of Diana White, R.N.

Jackson first spent time in federal custody at the
county jail in March 2014. Nurse White noted many
problems with care of Jackson at the jail.  The jail
ordered lab work to check Jackson's bleeding time, but

_____

3.   Jackson also asked Nurse White to examine his
treatment at Jackson Hospital and the Columbia Regional
Care Center, a private detention center.  Nurse White
concluded that both facilities provided adequate care.

there were no records of this lab work.[4] On one occasion, Jackson had a priapism (prolonged erection)--a condition that requires immediate treatment--that started at 3:00 a.m., yet jail staff did not take him to the hospital until 4:00 p.m.--13 hours later. Jackson also asked his family to bring him adult diapers or briefs, apparently because the jail would not provide them. The medical records were incomplete, as the nurses frequently did not take notes of what occurred during their treatment of Jackson. In June 2014, the nurses removed a catheter that tore Jackson's penis, but there was no indication in the record whether the nurses assessed whether Jackson had a full bladder, or if they re-catheterized him. Jackson had to rest in his own urine due to his maltreatment.

---

4. Blood was sent to a testing facility in Michigan, taking days for the facility to learn of the results.

On June 19, 2014, Jackson had a sickle-cell crisis, but there was no indication that the registered nurse assessed his condition until June 22, 2014. When the nurse did assess him, the nurse found that Jackson said he had been vomiting for four days, had chest pains, diarrhea, could not eat, and could "taste[] urine and feces in his throat." Report on Montgomery County Jail Medical Records, Def.'s Ex. 7 (doc. no. 87). The nurses did not take out his catheter during those four days, which constituted a substantial delay in providing adequate medical care. After this episode, the United States Marshal granted permission for Jackson to be transferred to a hospital to evaluate whether he was suffering from sepsis. Upon admitting him in June 2014, the hospital doctor discovered that Jackson had 1300 cc of urine in his bladder, the equivalent of approximately five cups of urine--or enough to fill a space bigger than a grapefruit. He also had developed

gangrene on his penis, which the hospital operated on the next day, and suffered from acute, life-threatening, kidney failure (Jackson had had normal functioning before the county jail), gallstones, a Stage-4 decubitus tumor (which had deteriorated in jail from Stage 3), dehydration, hyperbilirubinemia, coagulopathy (blood-clotting impairment), a urinary-tract infection, and severe anemia. Jackson also was suffering from life-threatening sepsis that had spread throughout his body.

Nurse White found no record that Jackson had not complied with treatment and found "only rare indication of refusal, and none in the period leading up to the hospitalization." March 31, 2015 Report of Diana White, R.N. Def.'s Ex. 9 (doc. no. 87). The Medical Administration Record report states that Jackson refused his medication only twice during the 89 days he was at the county jail. In Nurse White's opinion, the

14

care provided did not meet professional nursing standards. Her testimony was detailed and credible.

The court was also presented with a very disturbing July 2015 letter from Dr. Donald Kern, M.D., the doctor that the United States Marshal Service turns to for medical decisions, to Jackson's health-care provider while in federal custody, Quality Correctional Health Care. Dr. Kern opined,

> "While MCDC [the county jail] is a handicap facility, it is neither designed nor staffed for someone with paraplegia. There are no nursing assistants to help Mr. Jackson with his ADLs [activities of daily living]. His need for warfarin puts him at risk for a serious bleed if he should fall when transferring. MCDC has no Hoyer lift, a device which would reduce the risk of both patient and staff injury. The infirmary room available for Mr. Jackson has a metal frame bed permanently welded into the cell, so the addition of his hospital bed occupies most of the remaining floor space of the room. Transfers are inherently less safe and nursing access is made more difficult due to this unavoidable architectural limitation. There is not enough space in his cell to house his wheelchair so he must remain in bed while in his cell. As a result, he is continually at risk for further skin breakdown and infection. So long as Mr.

15

> <u>Jackson is housed at MCDC, he is at significant
> risk of complications from his chronic medical
> conditions, and the staff are at risk of
> occupational injury while trying to meet his
> medical needs.   Mr. Jackson would be best
> served by being housed at a detention center
> with the ability to provide services akin to a
> skilled nursing facility</u>."

Gov't's Ex. H (doc. no. 87) (emphasis added).   There is
no indication that there was any significant change in
the conditions of the jail between when Jackson began
his first stint at the jail in March 2014 and when Dr.
Kern wrote this letter in July 2015.

In addition to being transferred to the hospital,
Jackson was transferred to a private medical detention
center in an attempt to stabilize his condition.   Nurse
White noted that both the hospital and the center
provided adequate care in contrast to the substandard
care Jackson received at the county jail.

Because of the treatment Jackson received at the
jail, and especially considering that this treatment
occurred on the court's watch, as the court contracts

with the county jail to house prisoners, Jackson was entitled to a substantial downward variance. See 18 U.S.C. § 3553(a)(2)(A) ("the court shall consider ... the need for the sentence imposed ... to promote respect for the law, and ... provide just punishment for the offense"). Compare United States v. Rodriguez, 213 F. Supp. 2d 1298 (M.D. Ala. 2002) (Thompson, J.) (granting downward departure [in a pre-Booker case] because a defendant in pretrial detention was raped by a guard "on this court's watch"). However, as discussed below, Jackson's history of misconduct limited the size of the variance.

## 2. Other Factors

Jackson asked for a sentence of probation or time served. As stated previously, given the unnecessary suffering Jackson experienced while in federal custody, the court ordinarily would have varied downward to a

sentence of only a year imprisonment, which would have amounted to time served. However, in determining how large a variance to give, the court was convinced that Jackson's conduct both before and after he became paraplegic warranted a more substantial sentence.

After he committed the 2013 robbery underlying the current prosecution for being a felon in possession of a firearm, but before he became a paraplegic, Jackson posted a picture of himself with a gun on Facebook. This gun possession not only was a federal offense, but also would have been a violation of his probation from his 2007 robbery conviction, in which he also had a gun. Further, as discussed earlier, Jackson was involved in an attempted assault six months later, and to make matters worse, a child was present during the shooting. Then, after he was paralyzed, but before his arrest, Jackson posted a video on Facebook in which he and a friend are flaunting guns. The court recognized

18

that Jackson lived in an area with significant gun activity, and that his behavior was affected by this reality.    The court was also cognizant that his behavior reflected youthful immaturity and, perhaps, an attempt to cope with the impact of his paralysis by trying to act 'tough'.    However, this did not give Jackson an excuse to possess guns and flaunt them on social media.    <u>See</u> 18 U.S.C. § 3553(a)(1) (listing the "history and characteristics of the defendant" as a sentencing factor).    Further, Jackson's behavior since becoming paralyzed indicated that he had not stopped engaging in dangerous conduct and, at the time of sentencing, could not be trusted to not endanger the public or himself were the court to grant supervised release in lieu of any imprisonment.

Due to his continuing illegal and dangerous misconduct and Jackson's need for time to mature and come to grips with his new situation in life, the court

granted Jackson a four-level downward variance and imposed a sentence of 40 months of incarceration, followed by three years of supervised release.  This sentence significantly reduced the punishment he would have faced to reflect the injustice he suffered while in federal custody, sufficiently punished Jackson for his misconduct, and sufficiently protected him and the public from future dangerous behavior. See 18 U.S.C. § 3553(a)(2)(D)  (requiring  sentencing  courts  to consider the need "to protect the public from further crimes of the defendant").

***

For all of these reasons, the court found that the sentence imposed was sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

DONE, this the 23rd day of February, 2017.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

20